### FARNSWORTH v. RUDOLPH et al.

(Supreme Court, Appellate Division, Fourth Department. November 15, 1910.)

DEEDS (§ 211*)—EXECUTION—MENTAL CAPACITY.

 Evidence *held* to show sufficient mental capacity of the grantor when he made a deed, and that he intended to make the disposition evidenced thereby.

 [Ed. Note.—For other cases, see Deeds, Cent. Dig. § 638; Dec. Dig. § 211.*]

 Williams, J., dissenting.

Appeal from Judgment on Report of Referee.

Action by Oliver J. Farnsworth against Gustavus Rudolph, Elizabeth Rudolph, and others. From a judgment upon the report of a Referee, in favor of the plaintiff against the said defendants for $2,-

412.70, costs and disbursements, and directing the delivery of the possession of certain real property therein mentioned to plaintiff and the defendants, other than the defendants Gustavus Rudolph and Elizabeth Rudolph, the latter appeal.  Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

George B. Burd and George Clinton, for appellants.

O. P. Stockwell, for respondent.

KRUSE, J.  The sole question presented by this appeal is whether the grantor named in the deed of conveyance, which this action is brought to set aside, was of sufficient mental capacity to make the deed, and understood the nature of the transaction.  The truthfulness or falsity of the various witnesses is not so much involved as is the effect of their testimony and the conclusions to be drawn therefrom.

The facts are quite fully stated in the opinion of Mr. Justice WILLIAMS.  That the grantor was addicted to drunkenness, was vulgar and profane, untidy in appearance, filthy in talk, especially when drunk, may be conceded.  But with all his faults he seems to have been thrifty and able to keep together a large property.  He was strong in his likes and dislikes, firm in his opinions, not lacking in shrewdness and business sagacity, and whether drunk or sober able to take care of himself in a trade or in making a bargain, and did not extravagantly or improvidently spend his money, except for his own self-indulgence.  He may have been morally depraved, but moral depravity is not mental incapacity.

The learned referee, although expressing doubt in his opinion that the mind of the grantor was in such a condition as not to understand the nature of his acts before he was confined to his home during his last illness, reaches the conclusion that at the time of the execution of the deed his mental faculties were such that he was unable to comprehend the nature of the transaction, and in his decision makes deductions from the evidence, which, if warranted, sustain his decision setting aside the conveyance.

It seems to me, however, that the entire evidence, in connection with facts and circumstances not in dispute, is such as to lead to the conclusion that the deceased understood the nature of the transaction, and that he disposed of that part of his property covered by the deed and the will made at the same time precisely as he intended to do.

He was confined to his home for several weeks before he died. He talked intelligently, was not intoxicated, and seemed to realize that he was mortally ill.  While he grew weaker, physically, his mind was clear up to the very last.  Two days before his death he sent for the village justice of the peace, whom he knew, who drew the deed and will.  The deed conveyed the farm to the defendants, Rudolph, husband and wife, and the will disposed of certain articles of personal property to the wife, consisting principally of household furniture and other articles upon the farm, worth about $900; leaving undisposed of the bulk of his personal property, amounting to about $37,000, largely in stocks and securities.

Much stress is laid upon the circumstance that Farnsworth, the grantor and testator, at the time the deed and will were drawn, declared that none of his relatives should have any of his property, as indicating that he did not fully comprehend the nature of the transaction, inasmuch as he left undisposed of the bulk of his estate. When considered in connection with the other circumstances, I do not think that circumstance deserves the stress given it. What evidently was uppermost in his mind was to provide for the Rudolphs. He did that by disposing of the property to them as he had so often said he would do. He was ill and cared little or nothing for his relatives. Under the circumstances, it is not strange that he should have left the rest of his property to be disposed of later, if he recovered; or let the law dispose of it, as he had theretofore stated. Two months before his death, he told the witness Moyer that he was going to give his farm and all there was on it to the Rudolphs, and leave the rest of the stuff for his nieces and nephews to scrap over; and, when Dr. Gipple approached him about endowing the village school or library, he said to him that he was going to give the farm to the Rudolphs, and that he did not care what became of the rest of the property.

I think he understood that he was making a deed of the farm, and just what property was included in the will. He named the articles, adding some from time to time, as the will was being drawn. When the papers were ready for his signature, he was raised up to write his name, but stated that he would make a mess of it, and made his mark. The transaction was done openly. There is no finding of undue influence, and no evidence which would warrant such a finding.

The disposition he made to the Rudolphs was, as it seems to me, most natural. He had no near relatives. His stepmother and aunt, an aged lady, lived in Chicago. His other relatives were cousins, nephews, and nieces. None of them lived near him or cared for him (at least as he thought), or he for them, with the possible exception of a niece, the daughter of his wife's brother; but after the death of his wife the brother-in-law incurred his dislike. He was on intimate terms with the Rudolphs. Rudolph commenced working for him on the farm in question about 12 years before his death. About 4 years thereafter he married and went to live in the little house across the way from the Farnsworth home. Children were born to the Rudolphs. Farnsworth and his wife were fond of the children. Mrs. Rudolph helped Mrs. Farnsworth about her housework, and Rudolph continued to work on the farm until Farnsworth died.

Before the death of Mrs. Farnsworth (which occurred about two years before the death of her husband), the subject of eventually leaving the farm to the Rudolphs was talked over between Farnsworth and his wife. Farnsworth declared over and over again, both before and after the death of his wife, that he intended to take care of the Rudolphs; that they had been kind to him, made a home for him, taken care of him, and waited on him "hand and foot," as he expressed it. While Farnsworth continued to live in his own house after the death of his wife, he boarded at the Rudolphs', and prac-

tically made his home there, and, whether drunk or sober, Farnsworth was looked after by the Rudolphs.

While it is not claimed that Rudolph was not paid for his work on the farm, or that Farnsworth did not pay for his board, or that any legal claim exists against Farnsworth or his estate for the care and attention they gave him, it is entirely reasonable that he should do as he said he would: Take care of Rudolph and his family and give them the farm and the articles included in the will.

I think he intended to make that disposition, that he had mental capacity to do so, and that he accomplished his purpose; and I know of no reason why the courts should struggle to set it aside in favor of collateral relatives who did nothing toward accumulating the property and for whom he did not care, as against the Rudolphs, who befriended him, put up with his eccentricities and shortcomings, and cared for him.

I think the judgment should be reversed, on the law and facts, and a new trial ordered, with costs to the appellants to abide the event.

Judgment reversed. All concur except WILLIAMS, J., who dissents in an opinion.

WILLIAMS, J. (dissenting). The judgment should be affirmed, with costs.

The action was brought to have a deed of a farm canceled, made by George D. Farnsworth to the defendants, Rudolph and wife, on the ground of incompetency, undue influence, want of execution and delivery, etc. The deed was executed during the evening of August 15, 1905, and Farnsworth died during the night of August 17, 1905. The farm was worth about $15,000. At the same time the deed was executed, a will was made giving Mrs. Rudolph about $900 of personal property upon the farm. There was left, undisposed of, personal property worth about $30,000. Farnsworth had lived on the farm where he died all his life and was 73 years old. He left no widow surviving, and no children or descendants of children. His only heirs and next of kin were collateral relations. Rudolph began to work for Farnsworth on his farm 12 or 14 years before Farnsworth's death, and continued so to do until Farnsworth's death. Rudolph was unmarried when he went there, and lived in Farnsworth's family until he married his present wife about eight years before Farnsworth's death. Then the Rudolphs went to live across the road and remained there until just before Farnsworth died. The wife of Farnsworth died about two years prior to Farnsworth's death. After her death Farnsworth continued to live in his own home, taking a part, at least, of his meals at the Rudolphs'. A short time before Farnsworth died, the Rudolphs moved into Farnsworth's house, and nursed and cared for him until he died. Farnsworth for many years had used intoxicating liquors to excess. He had syphilis at one time, and had dropsy at last. He was confined to his house for several weeks before he died, and for several days at the last to his bed. The deed and will were drawn by one Bohmer, who took the acknowledgment of the deed and with one Petrell witnessed the will; Bohmer supervising its execution, and Petrell being named as executor therein. Bohmer was sent for

by Mrs. Rudolph, and he gave evidence on the trial in great detail as to his interviews with Farnsworth relating to the preparation of the deed and will. The theory of the plaintiff was that Farnsworth's mind became so weak the last weeks and days of his life that he was not competent to understand the deed and will he made, and that in this condition he was at least unduly influenced to make them.

I do not intend to go over the evidence or discuss the facts appearing in the record. The referee patiently listened to the evidence and saw the witnesses, and I assume the Rudolphs also. He has written a lengthy report, referring to more or less of the evidence, and has come to the conclusion that the deed should be set aside, because, as he states:

"I am forced to the conclusion that, at the time of the execution of this deed in question, the mental faculties of the grantor were such that he was absolutely and completely unable to comprehend the nature of the transaction, and did not have sufficient capacity to comprehend and collect in his mind the particulars or elements of the business to be transacted, and to hold them in his mind sufficient length of time to perceive at least their obvious relation to each other and to them."

It is evident that there was testimony to support this finding and conclusion. The evidence was conflicting, and the referee could have found support therein if he had arrived at a contrary conclusion. He had a better opportunity than the court on appeal has to ascertain the truth.

The appeal is purely on the facts. No questions of law are raised. We should not reverse on the facts. If referees are to be appointed to hear, try, and determine such cases as this, we should let them perform their duty, and not interfere and set aside their decisions, where the evidence is so conflicting as it is here.